Carr Unemployment Compensation Case.
Progress Manufacturing Company, Inc.,
Appellant, *v.* Unemployment
Compensation Board
of Review.

Argued March 22, 1961. Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*Geoffrey J. Cunniff,* with him *Josephine H. Klein,* for employer, appellant.

*Sydney Reuben,* Assistant Attorney General, with him *Anne X. Alpern,* Attorney General, for Unemployment Compensation Board of Review, appellee.

*Richard Kirschner,* with him *Louis H. Wilderman,* for claimant-intervenors, appellees.

OPINION BY ERVIN, J., April 13, 1961:

These four appeals apply to approximately 164 former employes of Progress Manufacturing Company, Inc. (hereinafter called "Progress" or "company"), all of whom were awarded unemployment compensation benefits by the Bureau of Employment Security, the referee and the Board of Review. The employer appealed.

The claimants were represented, for collective bargaining purposes, by Local 2005 of the International Brotherhood of Electrical Workers (hereinafter called "union"). The collective bargaining agreement between union and Progress contained the following provision: "The Union and Employer agree that there shall be no strikes, boycotts, lockouts, slow-downs, curtailment of work, restriction of production by employees during the life of this Agreement, and that in the event differences or disputes should arise between Employer or Union, or should any local trouble of any kind arise in the plant, there shall be no suspension of work by employees on account of such differences, but shall be processed as stated in Article IV, 'GRIEVANCE PROCEDURE', of this Agreement."

The agreement also contained a provision reserving to Progress the right to fire or suspend employes for cause.

On October 17, 1958 two employes were discharged by Progress. Their discharge was then reduced to a suspension and Progress agreed to submit the matter to arbitration if the whole working force reported to

work on October 20, 1958. The union proposed that the dispute be arbitrated with the understanding that the two suspended employes be permitted to work until the arbitration award had been rendered. Progress rejected this proposal. Thereupon, on October 20, 1958, most of the 900 employes failed to report for work and operations entirely ceased on October 21, 1958. On October 24, 1958 Progress sent notices to all employes on the payroll as of October 17, which read as follows: "You are hereby notified that, due to your participation in the unlawful work stoppage at this plant, and because of your violation of Sec. 4, Para. (C) of the Company Policy Bulletin, you are suspended until further notice. When and if you are recalled you will be reinstated with full seniority rights, benefits, and other privileges. It is suggested that you do not undertake any action of any kind which might jeopardize your likelihood of recall." The other notice read as follows: "In order for the Company to determine when Plants I and II will resume operations, we are enclosing a card for your signature if you are interested in returning to work. Please note that if you are recalled, your former seniority status, and all other rights, privileges, and benefits will be restored to you."

All of the company's employes returned the cards, indicating they would be interested in returning to work if and when recalled. On October 28, 1959 Progress began to recall employes in accordance with the company's judgment as to the worker's qualifications, based on examination of their individual work records. Many employes returned on October 31 and by November 4, 1958, 750 had been recalled. In recalling the employes, management scrutinized work records and decided that certain people were not qualified and therefore did not recall those individuals and included among them were all of the claimants involved in these appeals.

On November 10, 1958 the claimants were informed in writing that their employment was terminated.

Although differently worded, the decisions of the bureau, the referee and the board of review were all based on an underlying ruling that after October 28, 1958 the claimants' unemployment was not due to the existence of a labor dispute since the labor dispute was ended and the plants reopened as of that date. The mere fact that the strike had been ended, in our judgment, did not terminate the claimants' ineligibility based on their willful misconduct.

Section 402 of the Act of December 5, 1936, P.L. (1937) 2897, §402, as amended, 43 PS §802, sets forth five specific, independent, alternative grounds for an unemployed worker's ineligibility for unemployment compensation benefits. That section reads in pertinent part as follows: "An employe shall be ineligible for compensation for any week . . . (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute . . . at the factory, establishment or other premises at which he is or was last employed: . . . (e) In which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work. . . ."

All parties agree, and the board itself found, that the strike in this case was in violation of a collective bargaining agreement. Participation in such a strike constitutes willful misconduct for which Progress had an absolute, legal right to discharge the strikers: *Muldoon Unemployment Compensation Case,* 170 Pa. Superior Ct. 625, 90 A. 2d 599; *Kern Unemployment Compensation Case,* 172 Pa. Superior Ct. 324, 94 A. 2d 82; *Gutshall Unemployment Compensation Case,* 173 Pa. Superior Ct. 251, 98 A. 2d 257.

In *Weimer Unemployment Compensation Case,* 176 Pa. Superior Ct. 348 (allocatur refused, ibid xxvi), 107 A. 2d 607, in an opinion written by President Judge

RHODES for a unanimous court, it was held that the employes were ineligible for unemployment compensation even though the agreement between the company and the union did not contain a no strike clause. In that case Judge RHODES said, at pages 353, 354: ". . . the action of claimants in remaining away from work, when they had no grievance or dispute concerning their conditions of employment, was a clear violation of their agreement, and they were guilty of willful misconduct under the provision of section 402(e) of the Law. . . . their acting in concert in quitting their employment was voluntary and willful, and furnished good reason for their subsequent discharge."

It is argued by counsel for the claimants that the discharge of the claimants did not occur until November 10, 1958; that this was three weeks after the work stoppage and two weeks after the plant was back in operation and 750 employes had been recalled; that this establishes that the reason for the discharge was unconnected with their participation in the work stoppage and was actually predicated on their previous work record. It is our opinion that this is immaterial. Claimants' participation in the illegal strike gave Progress an absolute right to discharge them for willful misconduct, at least so long as it did not condone the misconduct.

In *Mackay Radio and Telegraph Co.*, 96 N.L.R.B. 740, 743, 744, it was said: "In view of the unlawful character of the strike, the Respondents were privileged to solicit the return of the strikers in an effort to terminate the strike, and at the end of the strike to discharge, discipline, or reinstate on their own terms employees who participated therein."

Even permitting employes to return to work for awhile would not, under all circumstances, preclude the subsequent discharge for illegal strike activities: *Bechtel Corp.*, 127 N.L.R.B. No. 110, p. 6, 46 LRRM

1115. It was the employer's prerogative whether it would recall the employe: *Department of Labor and Industry v. Unemployment Compensation Board,* 148 Pa. Superior Ct. 246 (allocatur refused, ibid xxiii), 24 A. 2d 667. In that case, President Judge KELLER said, at page 248: "If it is clear that a person's unemployment is the result of his own fault, he is not eligible for compensation under the Act, irrespective of his willingness to apply for, or accept suitable employment when offered to him, or that his leaving the work was not wholly voluntary.

"The claimant in this case became unemployed by reason of his conviction and imprisonment for larceny. . . . When released, he found that his employer had hired another person to do the work formerly done by him. An employer cannot be blamed because of his unwillingness to employ a thief, or one guilty of a crime involving dishonesty or moral turpitude, whether the offense was committed to his injury or another's. He may be willing to give his employe another chance, but this is his personal prerogative." See also *Salvitti Unemployment Compensation Case,* 189 Pa. Superior Ct. 102, 104, 149 A. 2d 586.

Progress' waiver of its rights as to some dischargees did not confer eligibility on the others who were not recalled to work. In *United Elastic Corp.,* 84 N.L.R.B. 768, the National Labor Relations Board, at page 777, said: "Since the Respondent's discharge of the strikers on September 5 was thus lawful, it necessarily follows, as contended by the Respondent, that it was free thereafter to exercise any choice it saw fit with respect to the reemployment of the dischargees. Accordingly, the Respondent could also lawfully refuse, as it did, to reemploy some of the dischargees, and to take back others on such terms as it chose to impose." See also *Thayer, Inc. of Virginia,* 125 N.L.R.B. 222, 45 LRRM 1089; *National Labor Relations Board v. Clearfield Cheese*

*Co.*, 213 F. 2d 70, where Judge McLaughlin said, at page 75: "Where the employer sees fit to waive its rights to terminate because of misconduct the employment of particular employees it can hardly be assumed to have foreclosed itself from rejecting any other employees in the same category."

We feel that the claimants are unemployed primarily because of their own misconduct. Having participated in an illegal strike they were subject to such action as their employer might choose to take. The mere fact that it recalled some because of a good work record and refused to recall others because of a bad work record is immaterial. The situation is similar to a string of fire crackers connected by a fuse. If the first is lighted the fire runs down the fuse and lights the others. If the first is not lighted the others remain intact. In our judgment, if claimants had not participated in the illegal strike they would still be at work. Their unemployment is therefore primarily due to their own misconduct.

The decision in each appeal is reversed.

---

DISSENTING OPINION BY WRIGHT, J.:

I respectfully dissent. In *Weimer Unemployment Compensation Case*, 176 Pa. Superior Ct. 348, 107 A. 2d 607, relied upon by the majority, the Board found that claimants' discharge was due to their wilful misconduct. In the instant cases, however, the Board found that claimants' discharge "was not the result of willful misconduct in connection with their work". The inferences to be drawn from the testimony are for the Board and its findings, if supported by competent and substantial evidence, are conclusive and binding upon the appellate court. See *McGinnis Unemployment Compensation Case*, 184 Pa. Superior Ct. 95, 132 A. 2d 749.

The notice from the employer under date of October 24, 1958, was a suspension, not a discharge. It expressly anticipated recall and reinstatement "with full seniority rights, benefits and other privileges". It was accompanied by a letter "enclosing a card for your signature if you are interested in returning to work". Each of the claimants herein involved returned this card indicating that he was available for work.

On October 28, 1958, the employer began to recall employes in accordance with management's judgment as to their qualifications. The deciding factor in determining whether a particular employe should be recalled was not his participation in the unlawful strike, which had then ended, but his individual work record. By November 7, 1958, seven hundred and fifty of the approximately nine hundred employes had been recalled. Under date of November 10, 1958, the claimants herein involved were notified for the first time that "your services with this Company are terminated". This notice did not assign any reason for the termination.

There is no evidence, nor does appellant assert, that the prior work records of these claimants indicated any wilful misconduct. The Board was not required to adopt appellant's contention that claimants were discharged for wilful misconduct because of their participation in the work stoppage. Their conduct did not differ in any respect from that of the employes who were recalled.

It is my view that the decisions of the Board should be affirmed.

MONTGOMERY and FLOOD, JJ., join in this dissent.