134 Ind. App. 418 (1963)
188 N.E.2d 281
FRAZIER
v.
REVIEW BOARD OF INDIANA EMPLOYMENT SECURITY DIVISION ET AL.
No. 19,700.
Court of Appeals of Indiana.
Filed March 5, 1963.
Rehearing denied April 3, 1963.
*419 William D. Hall, of Indianapolis, for appellant.
Grace M. Curry, James E. Bingham, Bingham, Summers & Spilman, of counsel, of Indianapolis, for appellee Non-Ferrous Foundry.
Edwin K. Steers, Attorney General and Keith Campbell, Deputy Attorney General, for appellee Review Board.
PFAFF, J.
This was an action brought by Poney Frazier against the appellee, Non-Ferrous Foundry, *420 under the Indiana Employment Security Act in which the Employment Security Division Review Board affirmed the referee's decision to deny benefits to the appellant-claimant. Since the filing of this appeal, the original appellant, Poney Frazier, died on February 19, 1962, and Lucile Frazier, as administratrix of the estate of Poney Frazier, was substituted as appellant herein on January 14, 1963.
Poney Frazier was discharged from his work on February 20, 1961. The referee determined that he was discharged for misconduct in connection with his employment; therefore he was not entitled to benefits under § 52-1539, Burns' 1951 Replacement (Supp.). From this determination Poney Frazier appealed to the Review Board. The claimant's application for leave to introduce additional evidence was denied for the reasons that the same evidence was available at the referee's hearing and that it was not apparent on its face that it would have changed the outcome of the case. The Review Board made the following statement of facts, findings and conclusions:
"STATEMENT OF FACT: It has been the custom in this employer's foundry for each man engaged in trimming castings to load his own trimmings into a wheelbarrow and wheel them to the bins. On this particular case in question herein, however, the claimant's foreman, under whom he had worked for three or four years, had himself trimmed some castings on the previous Saturday and loaded the trimmings on claimant's wheelbarrow. On the following Monday, the claimant dumped the trimmings out of his barrow and onto the floor, and three times refused the foreman's direct order to reload his barrow and wheel the trimmings to the place designated by the foreman. To each said request of the foreman that the claimant reload his barrow, the claimant simply answered `No,' whereupon the foreman `rang him out.' The claimant thereupon went to the president *421 of the company, who informed the claimant that the foreman was his boss.
"FINDINGS AND CONCLUSIONS: The claimant refused to carry out the lawful order of his foreman, only because he thought it was unusual and varied from what the claimant believed was the established way of doing things. Nevertheless, there was nothing unreasonable about it and the foreman had the right to give it and to expect the claimant to carry it out. The execution of this proper order would not have been prejudicial or detrimental to the claimant in any way. The president of the company backed up the authority of the foreman. The claimant was discharged for industrial misconduct in connection with his work on Monday, February 20, 1961."
While § 52-1542(k), Burns' 1951 Replacement (Supp.), provides that decisions of review boards are conclusive as to questions of fact, our Supreme Court stated in Warren v. Indiana Telephone Co. (1940), 217 Ind. 93, 26 N.E.2d 399, that the requirements of due process necessitated some sort of review of administrative decisions. On page 118 of that opinion, the court said:
"In ascertaining whether the finding of the administrative agency meets the requirements of due process, the court will look to the substance rather than the form. The mode by which the facts were found will be regarded as a means rather than an end, and the finding will not be set aside because the agency did not conform to the court-made formulas of proof. If, however, it should be made to appear that the evidence upon which the agency acted was devoid of probative value; that the quantum of legitimate evidence was so proportionately meagre as to lead to the conviction that the finding does not rest upon a rational basis; or that the result of the hearing must have been substantially influenced by improper considerations, the order will be set aside, not because incompetent evidence was admitted, *422 but rather because the proof, taken as a whole, does not support the conclusion reached."
In addition to a review of the proceedings of the Review Board in accordance with the due process standards stated in the Warren v. Indiana Telephone Co., supra, the court looks at the facts which the Review Board sets out as constituting "misconduct" within the terms of § 52-1539, Burns' 1951 Replacement (Supp.), in conjunction with opinions of the Appellate Court which have defined the word "misconduct" as used in the Statute.
In Merkle v. Review Bd., Emp. Sec. Div. (1950), 120 Ind. App. 108, 112, 90 N.E.2d 524, Judge Crumpacker speaking for this court cites with approval an annotation from A.L.R. as follows:
"The great majority of the cases on the subject under consideration sustain the rule that `in order to constitute `misconduct' within the meaning of the unemployment compensation acts excluding employees discharged for `misconduct' from their benefits, an act must show a wanton or wilful disregard for the employer's interests, a deliberate violation of the employer's rules, or a wrongful intent." Anno., 146 A.L.R. 243.
Later in the same year in A. Winer, Inc. v. Review Bd., Emp. Sec. Div. (1950), 120 Ind. App. 638, 95 N.E.2d 214, this court affirmed the determination of the board that the employee was properly discharged for misconduct for failure to properly oil a serging machine, which she operated, after repeated instructions and warnings so to do. As the basis for this decision, the court relied upon Merkle v. Review Bd., Emp. Sec. Div., supra, and upon the following definition of "misconduct," which the court quotes on page 641:

*423 "It is conduct `evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intention and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer.' Boynton Cab Co. v. Neubeck (1941), 237 Wis. 249, 296 N.W. 636. And see Massengale v. Review Bd., etc. (1950), 120 Ind. App. 604, 94 N.E.2d 673."
In the later decision, Osojnick v. Rev. Bd., Ind. Em. Sec. Div. et al. (1959), 129 Ind. App. 515, 158 N.E.2d 656, this court remanded the case to the board because the facts found were insufficient to show "misconduct." The court in arriving at its decision followed the language and reasoning in Merkle v. Review Bd., Emp. Sec. Div., supra, and A. Winer, Inc. v. Review Bd., Emp. Sec. Div., supra.
In light of the Review Board's "Statement of Fact" that it was "the custom in this employer's foundry for each man engaged in trimming castings to load his own trimmings into a wheelbarrow and wheel them to the bins" and in light of the foreman's order that claimant carry trimmings, which he did not cut, back to the bins, the ultimate finding that appellant was guilty of "misconduct" under the provisions of § 52-1539, Burns' 1951 Replacement (Supp.), does not follow from the "Statement of Fact." The actions of the claimant lack much of the elements of misconduct as that term has been above defined and construed. We do not believe the Board's determination is based upon a substantial factual foundation.
*424 Reversed.
Mote, P.J., concurs; Kelley, J., concurs with opinion in which Hunter, J., concurs.

CONCURRING OPINION
KELLEY, J.
The Board gave as a statement of fact that it had been the "custom" in the employer's foundry for each man to load his own trimmings into a wheelbarrow and wheel them to the bins. I find no evidence of a "custom" in the regard mentioned. The Board also states that the foreman of the decedent trimmed some castings and put them in decedent's wheelbarrow and the latter dumped them out the following Monday; that the decedent three times refused the order of the foreman to reload the trimmings and wheel them to the place designated by the foreman.
The employer's evidence establishes that decedent had worked for the appellee employer for twelve years and that during all that time the employer had had no trouble with decedent and had never been "dissatisfied" with his work. The evidence further shows that the appellee employer keeps scrap metal which is apparently "sawed off" and put in wheelbarrows and put in "bins." It is inferrable from the direct evidence that the metal is of different kinds or grades and the metals are kept in separate bins.
Some ten years prior to the involved occurrence, a Mr. N.E. Baker, president of the appellee employer, at a time when the decedent had picked up and put "in the #3 wheelbarrow" the wrong kind of metal, "made" the decedent "go back and get it out of there" and then told decedent that "whenever I (decedent) cut it off that I was to carry it back and when someone else cut it off to let them carry it back."
*425 The foreman of appellee employer, under whom decedent had worked for "three or four years," came to the foundry on Saturday, February 18, 1961, sawed off some metal and put "one melt" in decedent's "wheel." On the following Monday, February 20, 1961, the decedent "threw it out" and the foreman testified that he told him to put it back and "he throwed it out again" and "I told him I wanted him to take it back to the cutting room and I asked him three times and he said `No' and I said I would ring him out and that is exactly what I did." (Emphasis supplied). There appears no evidence that the "cutting room" is one of the bins to which the metal is being taken by the wheelbarrow. Nor is there any evidence that the decedent knew that the metal in his wheelbarrow on said Monday morning was put in there by the foreman. The decedent testified: "He sent another fellow out there and this fellow does not know one piece of metal from another and I would throw it out as Mr. Baker told me to do." He continued: "I went to Mr. Baker and I told him what had happened and he said he was my boss and I told him that he was the one that had told me not to cut off the metal and he said `He is your boss.'" (Emphasis supplied.)
Said Mr. Baker testified: "I did not know anything about it until he (decedent) was discharged and you have to back up your foreman. (Emphasis supplied.) In answer to the question: "Had you previously told him to follow your instructions?", Mr. Baker said: "No, not that I know of. It might have been ten years ago." (Emphasis supplied.)
Out of this kind of evidence, the Board concludes that the claimant (decedent) refused to carry out the lawful order of his "foreman" and "only" because he *426 (decedent) "thought it was unusual and varied from what the claimant believed was the established way of doing things." (Emphasis supplied). Where is the evidence to support such a conclusion? If the decedent obeyed the foreman, then he violated the instruction given him by the president, Baker. If he followed the instruction of the president, then he disobeyed the foreman. Now, what was he to do? Either route he took led to violation of an order or instruction. He was caught in a dilemma. After twelve years of satisfactory service without any trouble occasioned by decedent, he is suddenly discharged because he clung to one horn of the dilemma. Then when he went to the president, said Baker, to see about what he should do, which was after the foreman had discharged him, he was told "He (the foreman) is your boss" and that it "was between the two of them (decedent and the foreman)."
It is difficult to perceive upon what theory or basis the Board concluded from the evidence in this record that decedent was discharged for "industrial misconduct." In Tyler v. Review Board, etc., et al. (1956), 126 Ind. App. 223, 228, 132 N.E.2d 154 we said:
"... the nature and appropriatness of the facts found by the Board rests, we think, in the circumstances made manifest by the evidence in each particular case. The properly substantiated act or conduct of the employee may, in one case, show a wanton or willful disregard of the employer's interest, and in another case a deliberate violation of the employer's rules, while in yet another case, a wrongful intent; ...". (our emphasis).
I find no circumstances made manifest by the evidence in this record, which properly substantiate an *427 act or conduct of the decedent, which show (a) a wanton or willful disregard of his employer's interest; or (b) a deliberate violation of the employer's rules; or (c) a wrongful intent.
Here the decedent had worked for this employer for twelve years without any trouble and with acknowledged satisfactory service. At the time of the occurrence which gave rise to the conclusion of "industrial misconduct," the decedent was sixty-four (64) years of age in 1962 and had applied for Social Security benefits. The foreman placed trimmings in decedent's wheelbarrow which the president of the employer foundry had previously told decedent "to let them carry it back." This set of circumstances builds up to an almost inescapable inference which lacks much in being compatible with the liberal construction which must be accorded the Employment Security Act (§ 52-1525 et seq., Burns' 1951 Replacement, as amended) to the end of alleviation of economic insecurity due to unemployment.
To do other than reverse the decision of the Board in this case, in my opinion, would not only be a manifest and notorious gross injustice but lend judicial approval to a scheme of conflicting rules of employment, the violation of either of which would subject an employee to summary discharge for misconduct in connection with his work. If our vaunted theory of economic security is to survive in the present day period of economic insecurity, it will be so only by impartial judicial scrutiny of the human values involved in the mercenary conception of security enactments and the abuse thereof.
Hunter, J., concurs.
NOTE.  Reported in 188 N.E.2d 281.